IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

SOCIETY OF PROFESSIONAL
ENGINEERING EMPLOYEES IN
AEROSPACE, INTERNATIONAL
FEDERATION OF PROFESSIONAL
AND TECHNICAL EMPLOYEES,
LOCAL 2001,

          Plaintiff,

vs.                            Case No. 14-1281-JTM

SPIRIT AEROSYSTEMS, INC,
          Defendant.

**MEMORANDUM AND ORDER
ON SUMMARY JUDGMENT**

This action is before the court on competing motions for summary judgment. The plaintiff, Society of Professional Engineering Employees in Aerospace, International Federation of Professional and Technical Employees, Local 2001 ("SPEEA"), seeks to compel arbitration of a grievance over employee health premium contributions. The defendant, Spirit Aerosystems, Inc. ("Spirit"), contends that this action is barred by collateral estoppel because this court previously decided this same issue against SPEEA in *SPEEA v. Spirit AeroSystems, Inc.*, No. 12-1180, 2012WL 5995552 (D. Kan. Nov. 30, 2012) ("*SPEEA I*"), *aff'd* 541 Fed. Appx. 817 (10th Cir. Sept. 17, 2013) ("*SPEEA II*"). Alternatively, it contends the grievance at issue is not arbitrable because: 1) Article 3 of the applicable collective-bargaining agreement (the "CBA") precludes the arbitration of class-wide disputes, and 2) Article 16 of the CBA mandates resolution of this grievance through the company's health plan and its administrator, not the grievance-arbitration process. The court finds that the CBA does not provide for arbitration as to the subject grievance.

## I.     Summary Judgment Standard

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## II.     Findings of Fact

### A.     The Instant Case

The material facts in this case are not in dispute. Spirit, based in Wichita, Kansas, is one of the world's largest independent producers of commercial aerostructures. SPEEA is a labor union and the certified bargaining agent for a group of Spirit employees known as the Wichita Technical and Professional Unit (WTPU). Approximately 2,141 employees were in the WTPU on July 1, 2013, and approximately 1,732 employees are members today.

The applicable CBA covering the WTPU provides, *inter alia*, various benefits to the employees and a procedure to resolve disputes between the parties. Article 3 of the CBA sets forth a progressive four-step grievance procedure to determine disputes. (CBA at 3, § 3.3). Step 1 requires "[a]ny employee having a complaint shall first bring it to the attention of his immediate supervisor." (*Id.*). Step 1 may be oral. If the grievance is not resolved or the employee is dissatisfied with the company's response, he may appeal that decision in three successive steps. Step 2 requires the employee to submit a written complaint to the employee's supervisor within ten (10) working days of the Step 1 decision. Step 3 allows appealing the grievance in writing to human resources, and Step 4 allows appealing the decision of human resources in writing to arbitration.

Article 16 of the CBA provides: "Benefits shall be provided as defined in the Plans and as described in Attachment A." (*Id.* at 30). Spirit's Employee Health and Welfare Benefit Plan (the "Health Plan"), incorporated by reference into the CBA, sets forth the framework for health benefits, including its funding and claims resolution. As to its funding, the Health Plan states that it is "designed to be funded by Employee contributions and by Employer nonelective contributions." (Health Plan at 1, § 1.02). Attachment A, the Benefits Matrix, set "Employee Premium Contribution" for health care benefits under the "Core" plan for the applicable period at 14% of medical premium cost. (Attachment A, CBA at 43). As for disputes, claims for fully insured benefits must be directed to the applicable insurer, while claims for self-funded benefits must be directed to the Plan Administrator, who "will decide [the] claim in accordance with its reasonable claims

procedures, as required by ERISA." (Health Plan at 16-17, §§ 10.02 and 10.03). The Health Plan accords the Plan Administrator "full power to administer this Plan in all of its details." (*Id.* at 14, § 9.01).

Like the CBA, the Health Plan expressly contemplates the possibility that the Health Plan may become self-funded. (CBA at 21, Article 9.3(e); Health Plan at 1, § 1.04). On July 1, 2013, Spirit changed from a fully insured medical plan with a private insurance carrier to a self-funded plan.

William Hartig is a Spirit employee and a member of the WTPU. On July 8, 2013, Hartig made a Step 1 oral complaint to his supervisor that Spirit had violated the CBA by deducting $35.75 from his paycheck for medical coverage. He posited that since Spirit was no longer paying a medical premium after changing to a self-funded health plan, his premium contribution should be zero. The next day, Hartig's supervisor responded that the change to a self-funded health plan does not mean that healthcare benefits are free.

On July 22, 2013, Hartig sent his supervisor an email that served as a Step 2 documented complaint. Hartig wrote:

> the Company had withdrawn a $35.75 deduction from my 7/3/13 paycheck for an item identified as 'Medical,' in violation of the terms and conditions of agreement Article 16, Group Insurance and Retirement Plans, which states 'Benefits shall be provided as defined in the Plans and as described in Attachment A.' Attachment A states that the Employee Premium Contribution for the Core Plan shall be 14% of medical premium cost for the Plan Year 7/13/13 to 6/30/14. As Spirit is no longer paying medical premiums, the Company's 'medical premium cost' is non-existent and 14% of zero dollars is zero dollars and not the $35.75 that was deducted from my paycheck.

In a letter dated August 30, 2013, Spirit denied Hartig's Step 2 grievance, stating: "Insurance coverage is voluntarily elected during the annual open enrollment period, and the deductions from your wages are accurate and proper." (SPEEA 90).

On September 12, 2013, Hartig wrote a Step 3 appeal and forwarded it to SPEEA representative Bob Brewer, whom he designated to handle the appeal. On September 16, 2013,

SPEEA sent a Step 3 grievance letter to Spirit and requested a Step 3 grievance meeting. On March 13, 2014, SPEEA sent a letter to Spirit demanding arbitration of the grievance.

On July 25, 2014, Spirit rejected SPEEA's Step 3 grievance and demand for arbitration, stating:

> [T]he WTPU contract does not authorize SPEEA to bring a grievance. And broad, class-wide issues such as this are not subject to the contract's grievance process. So SPEEA cannot compel arbitration over its grievance.

(Spirit 19-20). Spirit also stated that "any claims or disputes regarding self-funded benefits must be decided by the Plan Administrator pursuant to the described claim process." On August 28, 2014, SPEEA filed this lawsuit, asking this Court to compel Spirit to arbitrate the grievance over employee premium contributions.

### B. The Prior Case

In 2012, SPEEA filed a complaint to compel Spirit to arbitrate a dispute over the employee evaluation performance process. *SPEEA v. Spirit AeroSystems Inc.*, No. 12-1180, Complaint, ECF. No. 1. SPEEA alleged that Spirit violated Article 4 of the same CBA at issue in this case by unilaterally recalibrating the evaluation process. Spirit argued that: 1) Article 4 removed disputes regarding the employee evaluation process from the Article 3 grievance process, and 2) Article 3 did not allow SPEEA to file a union-company grievance on performance management issues. This court ruled on summary judgment that that grievance was not arbitrable for two reasons: 1) the CBA precluded the arbitration of broad, class-wide disputes because the explicit language of Article 3 indicated the grievance procedure was individualized in nature, and 2) Articles 3 and 4 of the CBA provided positive assurance that the parties did not intend to arbitrate disputes over the employee performance evaluation process. *SPEEA I,* 2012WL 5995552, \*6-7. The Tenth Circuit affirmed, concluding:

1) the grievance process did not cover union disputes over employee evaluations;

2) the language of the grievance procedure indicates that it ordinarily applies only to individual engineers or employees, but not the union;

> 3) the union cannot ordinarily bring class-wide grievances about Spirit's employee performance and evaluation process under the four-step grievance procedure; and
>
> 4) [t]he collective-bargaining agreements permit individual [employees] to seek redress over individual disputes, and the union can use this process only when it is complaining about a lockout.

*SPEEA II*, 541 Fed. Appx. at 819-20.

### III. Conclusions of Law

#### A. Arbitrability Standards

The Supreme Court has held that when a collective-bargaining agreement contains an arbitration provision, "there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 650 (1986) (internal quotation marks omitted). This rule reconciles the principle that "a party cannot be required to submit to arbitration any dispute [that] he has not agreed so to submit," *id.* at 648, with the federal policy and presumption favoring arbitration in the labor context, *id.* at 650-51.

Here, the CBA's general arbitration provision is drafted broadly to encompass "a written complaint involving the interpretation or application of this Agreement." (CBA at 3, § 3.1). SPEEA argues that because this provision is very broad, the grievance at issue falls within the definition of an arbitrable dispute since it requires interpretation of the word "premium" as used in Attachment A of the CBA. The court rejects this argument. An arbitration provision simply means there is a presumption of arbitrability. That presumption may be rebutted if: 1) the CBA contains an express provision excluding the grievance from arbitration, or 2) if the court can say with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

SPEEA contends that there is no language in the CBA expressly excluding this grievance from arbitration or any forceful evidence indicating that this grievance is not covered by the arbitration provision. The court agrees with SPEEA that the CBA contains no express exclusion of

this grievance. Likewise, Article 16, via the Health Plan, does not provide a separate mechanism to resolve this grievance. There are, however, forceful evidence that Spirit did not agree to arbitrate this grievance.

> **B. Article 16, via the Health Plan, does not provide a separate mechanism to resolve this grievance.**

Spirit argues that the grievance at issue is not arbitrable because disputes arising under the Health Plan are subject to that plan's claims process. Spirit says the dispute at issue must be decided by the Plan Administrator pursuant to the plan's claims process. The court disagrees.

The Health Plan Claims Procedure provides a specific mechanism for resolving "[a]ny claim which arises under this Plan in which benefits are paid . . ." (Health Plan at 16, § 10.01). Disputes involving claims for fully insured benefits must be directed to the applicable insurer (*Id.*, § 10.02); while disputes involving self-funded benefits, must be directed to the Plan Administrator (*id.*, § 10.03). The dispute at issue, however, did not concern benefits.

Spirit argues that disputes regarding the manner in which employees must reduce their compensation to pay for health benefits fall directly within the Plan Administrator's purview. This argument mischaracterizes the dispute. There is no dispute regarding the manner in which employees must reduce their compensation – employees must elect to reduce their salary to pay for their share of the cost of selected healthcare coverage. The dispute is over the amount to be deducted from the employees' paycheck for healthcare benefits.

Although the Health Plan accords the Plan Administrator "full power to administer this Plan in all of its details" (*Id.* at 14, Article IX), that power does not include establishing the employee contribution rate for healthcare benefits. First, Attachment A, which set "Employee Premium Contribution" for the applicable period as "14% of medical premium cost," (CBA at 43), is proof that employee contribution for healthcare benefits was a subject of collective bargaining negotiations, rather than a subject within the Plan Administrator's discretion. Second, several provisions in the Health Plan indicate that it is the employer who calculates the employee

7

contribution rate, not the Plan Administrator. Section 5.01, in discussing the election and enrollment process, explains that employee contribution is determined by the employer:

> Except as may be required by the Plan Administrator, a Participant who has previously elected . . . to participate in this Plan but who fails to make an election or re-enroll . . . before . . . [the enrollment period expires] . . . will be deemed to have made the same election . . . and to have agreed to a reduction in compensation . . . equal to the **Participant's share of the cost (as determined by the Employer)** of providing such benefits.

(*Id.* at 11, § 5.01) (emphasis added). Similarly, the employer establishes the cost associated with retiree coverage. (Health Plan at 9, §4.05F). Section 11.04 also indicates that it is the employer who establishes the contribution rates. Section 11.04 provides that the employer may use protected health information to establish contribution rates and make recommendations regarding plan design. (*Id.* at 18, § 11.04G). For these reasons, the court finds that the Plan Administrator does not have the authority to set the employee contribution rate for healthcare benefits. Accordingly, the court concludes that the Health Plan does not provide a separate mechanism to resolve this grievance.

      **C.**    **Articles 3, 8, and 18 provide positive assurance that the grievance procedure does not cover class disputes over employee contributions for healthcare benefits.**

Spirit next argues that this grievance is not arbitrable because the CBA precludes the arbitration of broad, class-wide disputes. Spirit also argues that collateral estoppel precludes SPEEA from litigating the issue presented here because it was previously decided on the merits in *SPEEA I* and *II*. And aside from collateral estoppel, *SPEEA II* is binding precedent and requires concluding that the subject grievance is not arbitrable.

SPEEA argues that Spirit has misconstrued *SPEEA I* and *II* because those cases did not limit the scope of grievance topics to individual disputes. SPEEA claims those decisions focused on whether the union could use the grievance process to compel arbitration of class-wide grievances and did not decide whether an individual employee may bring a dispute over company policy; thus, collateral estoppel does not apply. SPEEA argues that the CBA's broad arbitration clause, the absence of an express exclusion, and the lack of any forceful evidence to suggest an individual is

barred from bringing a grievance that may affect more than that individual alone compels concluding the subject grievance is arbitrable. SPEEA insists that this grievance is an individual dispute because it was brought by an individual seeking individual relief.

As an initial matter, the court finds that the grievance at issue is a broad, class-wide dispute. It is not an individual dispute simply because an individual initiated the grievance and sought individual relief. Who initiated the grievance is irrelevant in determining classification of the grievance because the grievance procedure requires an individual employee to bring the grievance (except in limited circumstances not applicable here).[1] The requested relief is a factor, but it is not determinative because otherwise, the classification of the grievance would be susceptible to manipulation. Ultimately, it is the substance of the grievance that determines whether it is a class or individual grievance. Here, when the Health Plan shifted to a self-funded plan, the company allegedly violated the CBA when it unilaterally determined employee contributions for healthcare benefits and deducted that amount from every employee who had elected to obtain healthcare benefits through the company. Because this decision affected a number of people with the common attribute of electing to obtain healthcare benefits through Spirit, the subject grievance is a class dispute over employee contributions for healthcare benefits.[2]

The court next considers whether the CBA's grievance procedure covers a class dispute over employee contributions for healthcare benefits. The court concludes that it does not because several provisions in the CBA provide positive assurance that grievances must be individualized in nature. First, the language of § 3.3 indicates that the grievance procedure ordinarily applies only to individual employees. Second, the grievance procedure describes four progressive steps and requires

---

[1] *See* CBA at 3, § 3.3 (Steps 1 and 2 refer exclusively to the employee.). For grievances involving a layoff, discharge, suspension or involuntary resignation, an employee may start the grievance process at step 3, but that does not mean that the union initiated the grievance. CBA at 3, § 3.2. The union can only bring a grievance for a lockout. CBA at 30, § 15.1(d); *see also SPEEA I* and *II*.

[2] "Class" is "a group of people . . . that have common characteristics or attributes." *Black's Law Dictionary* 304 (10th ed. 2014).

the completion of each previous step. But like a union-company dispute about company policy, a class dispute over company policy is incapable of resolution at Steps 1 and 2. It makes little sense to require an employee to go through Steps 1 and 2, if the grievance cannot be resolved at those steps.[3] Third, § 3.6 confirms the individualized nature by stating: "each grievance appealed to arbitration shall be the subject of a separate and distinct arbitration hearing and decision." (CBA at, § 3.6). These are all indications that the grievance procedure was not meant to deal with class disputes.

SPEEA argues that the phrase "individualized nature" does not mean that individuals could grieve only disputes that affected that individual alone. The court finds this argument unpersuasive in light of § 18.2, which provides that "a grievance alleging . . . [discrimination] shall be subject to the grievance and arbitration procedure of Article 3 only if it is filed on behalf of and pertains to a single employee. Class grievances [alleging discrimination] are not subject to the grievance and arbitration procedure under this Agreement." (*Id.* at 31, § 18.2). Likewise, § 8.2 provides that a grievance over "[t]he granting of a deviation to allow such hiring shall not be subject to the grievance and arbitration process." *(Id.* at 18, § 8.2(c)). Because disputes over subcontracting deviations are generally class disputes, these two express exclusions provide positive assurance that Spirit did not intend to arbitrate class disputes. SPEEA's *expressio unius est exclusio alterius* argument fails because it ignores the fact that there are two ways to rebut the presumption of arbitrability: 1) through an express exclusion, and 2) when the court can say with positive assurance that the agreement did not cover the grievance at issue.

For the above reasons, the court concludes that, read in context, the language of Articles 3, 8 and 18 provide positive assurance that the parties did not intend to arbitrate class disputes over employee contributions for healthcare benefits. This conclusion is consistent with *SPEEA I* and *II*.

---

[3] Section 3.2 allows an employee to skip to Step 3 for grievances involving a layoff, discharge, suspension or involuntary resignation, but this exception is not applicable here.

In light of the court's conclusion that this grievance is not arbitrable, Spirit's collateral estoppel argument is moot.

**IT IS ACCORDINGLY ORDERED** this 21st day of January, 2016, that the plaintiff's Motion for Summary Judgment (Dkt. 57) is **DENIED**, the defendant's Motion for Summary Judgment (Dkt. 59) is denied as moot, and the defendant's Amended Motion for Summary Judgment (Dkt. 60) is **GRANTED**.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE